**FILED**

**April 8, 2026**

KAREN MITCHELL
CLERK, U.S. DISTRICT
COURT

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **DONNA CAROL FERNIHOUGH** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:25-cv-00525-Y** |
| | § | |
| **ACCLARENT, INC., INTEGRA** | § | |
| **LIFESCIENCES CORPORATION,** | § | |
| **PRECISION CONCEPTS** | § | |
| **INTERNATIONAL LLC, and** | § | |
| **PCB TECHNOLOGIES USA INC.** | § | |

---

## PLAINTIFF'S THIRD AMENDED COMPLAINT

---

1.     DONNA CAROL FERNIHOUGH files this Third Amended Complaint, complaining of ACCLARENT, INC. and INTEGRA LIFESCIENCES CORPORATION, in their legal, assumed, or common names (hereafter also referred to cumulatively as "DEFENDANTS"), and for cause of action alleges as follows:

## PARTIES

2.     DONNA CAROL FERNIHOUGH (also hereafter referred to as "PLAINTIFF") is currently a citizen and resident of Tarrant County, Texas.

3.     ACCLARENT, INC. (hereafter also referred to as "ACCLARENT") is a corporation organized under the laws of Delaware with its operation nerve center in Irvine, California. ACCLARENT is the actual or legal manufacturer, developer, assembler, distributor, marketer, and seller of the PRODUCT IN QUESTION (ACCLARENT ENT TruDi Navigation System together with its essential components and navigable devices) used in the surgical procedure in question on DONNA CAROL FERNIHOUGH. As the

actual or legal manufacturer, developer, assembler, integrator, distributor, marketer, and seller of the PRODUCT IN QUESTION, ACCLARENT retained and exercised control over the design, development, testing, manufacturing, and quality control of the component parts used in and the approved navigable devices used with the PRODUCT IN QUESTION. ACCLARENT was the manufacturer of the ACCLARENT Pivot Navigation Balloon Dilation System that was used during surgery on PLAINTIFF on May 19, 2023. ACCLARENT has had continuous business contacts with and in the State of Texas. It has purposely availed itself of the privilege of conducting business in Texas and has targeted Texas for the sale, distribution, and use of its products, including the PRODUCT IN QUESTION. The occurrence in question arises from these purposeful business strategies and activities, including the targeted marketing, distribution, and sale of the PRODUCT IN QUESTION. ACCLARENT, INC., is already subject to the jurisdiction of this Court through its invocation of the snap removal process.

4.      INTEGRA LIFESCIENCES CORPORATION (hereafter also referred to as "INTEGRA") is a corporation organized under the laws of Delaware with its operations nerve center in Plainsboro, New Jersey. INTEGRA acquired ACCLARENT and obtained certification as the legal manufacturer of the PRODUCT IN QUESTION. When INTEGRA assumed ownership of ACCLARENT, INTEGRA also became responsible for the liabilities and for the conduct of ACCLARENT relevant to the design, manufacture, development, assembly, distribution, quality control, marketing, and selling of the PRODUCT IN QUESTION, including its component parts and navigable devices. At all times relevant to the instant cause of action, INTEGRA has had continuous business contacts with and in the State of Texas. It has purposely availed itself of the privilege of

conducting business in Texas and has targeted Texas for the sale, distribution, and use of its products, including the products in question. The occurrence in question arises from these purposeful business strategies and activities, including the targeted marketing, distribution, and sale of the PRODUCT IN QUESTION. INTEGRA LIFESCIENCES CORPORATION is already subject to the jurisdiction of this Court through its invocation of the snap removal process.

## JURISDICTION AND VENUE

5.      The amount in controversy, exclusive of interest and costs, exceeds the minimum jurisdictional limits of this Court.

## INFORMATION AND BELIEF PLEADING

6.      Of necessity, many of PLAINTIFF'S allegations are based on information gathered by PLAINTIFF'S attorneys and inferences drawn from data available in the public domain. At all times relevant to this incident, PLAINTIFF was an ENT patient who was not involved in the selection of any surgical devices used during her surgery.

## OCCURRENCE IN QUESTION

7.      On May 19, 2023, DONNA CAROL FERNIHOUGH underwent a balloon sinuplasty procedure that Dr. Marc Dean performed using the ACCLARENT ENT TruDi Navigation System and its essential components and navigable devices (hereafter referred to as the "PRODUCT IN QUESTION") for orientation, navigation, and accuracy of location during sinus surgery. During the surgical procedure, the ostium of DONNA CAROL FERNIHOUGH'S sphenoid sinus "was identified with the navigation guidewire." Relying on the PRODUCT IN QUESTION for accurate navigation guidance, Dr. Dean inserted and inflated the ACCLARENT Pivot balloon. The patient began bleeding

massively when the balloon was deflated. Cat McCoy, an ACCLARENT representative who participated and assisted in the surgical procedure, reported that DONNA CAROL FERNIHOUGH's carotid artery "blew" with blood spraying all over. It is believed the PRODUCT IN QUESTION lost location accuracy and misguided Dr. Dean as to the patient's anatomy leading to the ACCLARENT Pivot ballon coming into direct contact with DONNA CAROL FERNIHOUGH'S carotid artery without any warning. DEFENDANTS knew that the PRODUCT IN QUESTION could lose accuracy suddenly without any warning to the user that the navigable devices were in a dangerous or wrong location. Radiology studies of DONNA CAROL FERNIHOUGH'S brain after the incident in question clearly show the kinked and coiled guidewire of an ACCLARENT Pivot balloon. DEFENDANTS knew that kinked or coiled guidewires in their balloon products such as the SpinPlus Nav and Pivot balloons can lead to location inaccuracy during ENT surgery. Any location inaccuracy can lead to serious injury of the brain, carotid artery, and other vital structures, particularly when operating in the sphenoid sinus.

8.     Dr. Dean, confronted with substantial quantities of blood obscuring the nasal and sinus cavity, again relied on the TruDi Navigation System and its navigated balloon in an attempt to stop the massive, life-threatening bleed from the carotid artery encountered during PLAINTIFF's surgical procedure. Dr. Dean used the TruDi Navigation System and its navigable Pivot balloon to guide him in an effort to tamponade the bleeding. Once again, the PRODUCT IN QUESTION was not accurate and erroneously caused Dr. Dean to place the ACCLARENT Pivot balloon in the subarachnoid space of PLAINTIFF's mid brain. The defective product caused catastrophic injury to DONNA CAROL FERNIHOUGH's carotid artery and then again to her mid brain, each of which

directly led to her stroke which caused life altering injuries and damages. The PRODUCT IN QUESTION used by Dr. Dean in the procedure in question is believed to have been defective, unreasonably dangerous, and a substantial cause of the injuries for which PLAINTIFF makes claim in this case.

9.      THE PRODUCT IN QUESTION includes an image guided, integrated navigation system using electromagnetic tracking and shielded microsensors at the distal tip of its navigable devices that are guidewire-based. Their purpose is to guide ENT surgeons during surgical procedures, particularly when the anatomy or bone obscures or blinds the physician to exact location. As the foundation of the navigation system, any defect with this process puts the physician in the wrong location and the patient in danger.

10.     ACCLARENT markets the PRODUCT IN QUESTION as providing consistent and reliable sub-millimeter accuracy. For this goal to be achieved, all components of the PRODUCT IN QUESTION must perform in compliance with design specifications. Just as importantly, all components must interact and connect to the system within design and performance specifications. This is particularly true when the PRODUCT IN QUESTION is used in the ostium of the sphenoid sinus when the physician is largely blinded by the anatomy and because there is minimal room for error or a catastrophic injury can occur given the adjacent location of vital structures.

11.     The PRODUCT IN QUESTION was originally a marriage between the CARTO system used for cardiac mapping during electrophysiology procedures in the heart and the non-navigable ENT tools that ACCLARENT had developed and already marketed. The merging of those products required adaptations which affected the connectivity and accuracy of the combined product now known as the ACCLARENT ENT

TruDi Navigation System with its navigable devices and essential components. The PRODUCT IN QUESTION includes the ACCLARENT ENT TruDi Navigation System, which uses a desktop Dell computer with software versions running such AI related functions as TruSeg and/or TruPath. Additionally, the system incorporates the emitter pad, hub, console, Patient Tracker, registration probe, Multi Instrument Adapters/dongles, and cabling system, as well as the "tools" which ACCLARENT marketed as pre-calibrated "plug and play" navigable guidewire-based devices with distal microsensors at the end. These tools include the TruDi NAV Suction, TruDi Curette, TruDi Probe, and various balloon systems to dilate the sinus cavities including the ACCLARENT Pivot Navigation Balloon Dilation System and/or the RELIEVA SPINPLUS® NAV Balloon Sinuplasty System with Navwire. This entire system, which ACCLARENT participated in conceiving, developing, integrating, assembling, marketing, distributing, as well as selling under the ACCLARENT name, forms an integrated navigation system hereafter referred to cumulatively as the "PRODUCT IN QUESTION".

## BACKGROUND

12.    In an effort to corner part of the lucrative ENT surgery market, two Johson & Johnson companies decided to merge their technologies into a singular product referred to in this Complaint as the PRODUCT IN QUESTION.  ACCLARENT decided to link its non-navigable ENT tools with Biosense Webster's (BWI) CARTO navigation system, a device used only for anatomical mapping and ablation procedures in the heart. The CARTO navigation system uses flexible guidewires that bend and are threaded through blood vessels to treat electrical issues within the heart.  ACCLARENT chose not to adapt navigation technology proven to be safe and effective through use in ENT

procedures by competitors. ACCLARENT own patent acknowledged that "guidewires may be rather flimsy or flexible by their very nature." Even with this knowledge about the problems associated with bendable guidewires, ACCLARENT created a new and largely untested guidance method which placed sensors at the distal tip of guidewire-based surgical instruments, including balloons used to open obstructed sinus cavities. ACCLARENT knew that guidewires by their very nature are prone to bending, kinking, and coiling in regular use in sinus surgery due to the bony nature of the sinus anatomy and the tortuous path that may be needed to complete any ENT surgery. With a sensor at the distal tip of a kinked or bent guidewire -based navigable device, the navigation system would predictably suffer from accuracy problems that could not be remedied and would literally point the user in the wrong direction. When navigable devices/tools are pointed in the wrong direction, they foreseeably pose a risk to damage vital anatomy such as the carotid artery or brain.

13.     An additional problematic design issue is the registration process that ACCLARENT chose to use to align the navigation system with the patient's CT imaging. ACCLARENT uses manual or tactile registration with a registration probe that also is guidewire-based. ACCLARENT admits in its patent documentation that "Various points on a patient's face may depress several millimeters under the force of the calibration instrument" which is the registration probe. This situation "**can provide a significant inaccuracy in the context of ENT or other surgical procedures**." Even with this awareness of the "significant inaccuracy" associated with a registration process based on contact with the patient's skin, ACCLARENT chose this method of registration for the PRODUCT IN QUESTION. There were safer and more accurate registration options

available, including the much more accurate contact -free registration. This design option was known to ACCLARENT because the corporation sought patents for this method of contactless registration long before DONNA CAROL FERNIHOUGH'S surgery.  In one of ACCLARENT'S patents, ACCLARENT unequivocally states that "a touchless registration system "can "result in more accurate positioning of the target within three -dimensional space because it reduces or eliminates the potential for flexibility of a touch calibration instrument or deformation of the patient's skin to introduce inaccurate registration data" into the process." ACCLARENT also held a patent for optical or photo registration many years before PLAINTIFF'S surgery. This form of registration uses photo technology to perform device registration and significantly improves accuracy since it is not impacted by the user or unique characteristics of a patient's skin. This superior technology had already been utilized by ACCLARENT'S competitors for many years. ACCLARENT made a business decision not to use contactless or optical registration in the PRODUCT IN QUESTION knowing tactile or manual registration would not provide optimum accuracy for safety in ENT surgery. ACCLARENT'S own patents tell the true story about the availability of the superior registration technology of contact free or optical registration. If a registration is inaccurate, the later navigation of the navigable devices will be correspondingly inaccurate as well.

14.    The choice of a tactile registration process using a registration probe that was guidewire-based was not ACCLARENT'S only dangerous choice. The registration process also requires users to place an adhesive Patient Tracker on the patient's forehead to serve as a primary point of orientation for the navigation of all the tools and devices. ACCLARENT chose to market a reusable Patient Tracker which was applied

with Tegaderm and could allegedly be used on up to fifty (50) patients before losing efficacy. Not surprisingly, the reusable Patient Trackers would move and lead to inaccurate navigation. The "Tegaderm sandwich "model caused numerous field reports of inaccuracy such that ACCLARENT realized it was dangerous to use. Even after ACCLARENT decided the reusable Patient Trackers were not safe and patients needed a disposable single-use tracker, ACCLARENT did not recall the reusable Patient Tracker or notify users that ACCLARENT no longer advised that it should be used. Instead, ACCLARENT allowed the reusable Patient Tracker to be used until the excess supply was exhausted. As a result, for many months or even years after ACCLARENT knew of the problems with reusable Patient Trackers, hospitals and doctors continued to use them because ACCLARENT failed to notify these end users of the dangers. On the date of DONNA CAROL FERNIHOUGH's surgery, CAT MCCOY, an ACCLARENT representative, allowed a reusable Patient Tracker to be used during DONNA CAROL FERNIHOUGH's surgery adding an additional known safety risk and location inaccuracy problem to the PRODUCT IN QUESTION.

15.     Similarly, the tools ACCLARENT designed and marketed used a guidewire with the sensor at the end for guidance. The guidewires, however, being flexible would kink and coil resulting in the guidance sensor pointing the user in the wrong direction. There was no warning system in the balloon tool assembly to alert the user to kinks or coils or that the navigable device was dangerously close to a vital anatomical location or structure. This manifested in DONNA CAROL FERNIHOUGH'S surgery where the guidewire on the ACCLARENT Pivot balloon device was literally coiled in a U shape as revealed in later radiographic studies.

16.    The sphenoid sinus region created additional guidance and location challenges when surgeons use the PRODUCT IN QUESTION. First, the anatomic location of that sinus cavity is the most posterior in the skull. It is known that with electromagnetic tracking navigation that the accuracy of navigation degrades as it proceeds more distant from the site of registration.  Location accuracy in this area is vital to patient safety due to the anatomic structures adjacent to this area.  DONNA CAROL FERNIHOUGH'S surgeon, Dr. Marc Dean, repeatedly complained that the navigation system lacked sufficient volume to navigate accurately in the sphenoid sinus. Dean's concern should have been a voice to whom ACCLARENT would listen on safety issues with its product. During the initial testing and development stage of the PRODUCT IN QUESTION, ACCLARENT enlisted the services of Dr. Marc Dean, as ACCLARENT'S paid consultant, researcher, and agent. ACCLARENT designated Dr. Dean as a "Key Opinion Leader" (KOL) and sought his guidance and clinical expertise in developing parts of the PRODUCT IN QUESTION. Despite this feedback from Dr. Dean, ACCLARENT determined that it would not devote resources to correcting this known issue and expanding the working volume (TruDi Zone) of the PRODUCT IN QUESTION. ACCLARENT made this conscious decision despite the known safety risks to patients having sinus surgery in the sphenoid sinus like DONNA CAROL FERNIHOUGH. ACCLARENT seemingly did not believe it was worth the resources to ensure patient safety.

17.    Not surprisingly, complaints began rolling in about the PRODUCT IN QUESTION having problems with location accuracy as early as 2019. ACCLARENT knew it was a multi-factorial problem based in part on poor registration technology, Patient

Trackers that moved rather than performing an essential function of anchoring navigation accuracy, and ACCLARENT's own guidewire-based navigable devices that kinked and coiled during use. ACCLARENT also learned of connectivity issues since the PRODUCT IN QUESTION ties two different medical devices together through adapters rather than a more stable direct connection. Even as reports of accuracy problems rolled in, Dr. Dean and other users of the PRODUCT IN QUESTION were not advised what post-market surveillance on the troubled product was showing. Dr. Dean, other users, and even ACCLARENT's own ENT representatives were not advised of what testing or investigation regarding the numerous product complaints showed. Nor did ACCLARENT inform Dr. Dean of the various known failure modes, incidents, accuracy investigations, post market testing results, and defects that ACCLARENT identified prior to his surgery on DONNA CAROL FERNIHOUGH. Despite the unresolved accuracy complaints in place and no identifiable root cause or fix in place, ACCLARENT decided to add artificial intelligence (AI) to the mix with the addition of TruSeg and TruPath in 2021. The decision was part of an ACCLARENT strategy to increase market share and market visibility in the ENT world. This addition of AI to the PRODUCT IN QUESTION by ACCLARENT did not improve accuracy, which was known by ACCLARENT before the AI component was released on the market. ACCLARENT continues to report to the FDA that there are accuracy problems with the PRODUCT IN QUESTION to the present day.

18.    Foundational to the accuracy issue was ACCLARENT's representation to the FDA and the public that the device was accurate to within 2 millimeters, but ACCLARENT had never actually tested that claim in humans. Jeff Hopkins, then the President of ACCLARENT, embarked on an advertising campaign that extolled the virtues

of the TruDi Navigation System as having "sub-millimeter" accuracy – a material misrepresentation about the PRODUCT IN QUESTION. The PRODUCT IN QUESTION has never achieved this degree of accuracy in actual clinical usage.

19. Without credible substantiation, ACCLARENT claimed and then marketed the PRODUCT IN QUESTION as providing navigation with consistent, reliable, submillimeter accuracy during ENT procedures such as sinuplasty. This claim, however, had never been proven during studies using actual human beings. The sole basis for the claim was an ACCLARENT commissioned study which used a plastic skull and electronic connection points to test location accuracy. When used in actual humans, however, the results were not replicated. Rather, ACCLARENT'S product navigation accuracy can be wildly inconsistent. ACCLARENT'S own consultants and ENT physicians reported to ACCLARENT that the navigation did not provide consistent or reliable submillimeter accuracy as promoted and marketed. There have been reports of variability as much as centimeters (not millimeters) from the desired target. ACCLARENT's own accuracy investigations demonstrating these same accuracy problems were kept hidden from physicians, hospitals, and even ACCLARENT sales representatives.

20. Despite knowing the accuracy problems, ACCLARENT continued to market the PRODUCT IN QUESTION as pre-calibrated "plug and play" components without any need to recalibrate at any time and still maintaining the system was accurate within 2 millimeters.

21. In 2019, ACCLARENT received numerous complaints regarding the PRODUCT IN QUESTION and particularly the RELIEVA SPINPLUS® NAV Balloon. The SpinPlus Nav balloon product designed and developed by ACCLARENT was prone to a

guidewire that kinked and a sensor that did not maintain connectivity. Both issues with this ACCLARENT balloon product were known to cause location inaccuracy with navigation. ACCLARENT made a business decision not to improve this product until ACCLARENT's Pivot Balloon product was introduced into the market around July 2021. The Pivot Balloon, also known as the Next Generation Balloon, was designed with an allegedly more robust guidewire to improve performance.  ACCLARENT's Pivot balloon product was supposed to replace the troubled ACCLARENT SpinPlus Nav balloon product which had been plagued with accuracy and mechanical problems. However, by the latter part of 2021, ACCLARENT suspended manufacturing of the Pivot balloon due to product nonconformity and problems with mechanics of the device as well as the ongoing problems of a guidewire that commonly kinked and coiled. Sometime before the surgical procedure on DONNA CAROL FERNIHOUGH, ACCLARENT again made the Pivot balloon available and an ACCLARENT Pivot balloon was used during her surgery. That Pivot balloon kinked, bent, and ultimately skewered her carotid artery. ACCLARENT decided finally to remove the Pivot Balloon product from the market after DONNA CAROL FERNIHOUGH's catastrophic injury once it became clear the manufacturing defects would be in ACCLARENT'S view too costly to remedy. The ACCLARENT SpinPlus Nav balloon remains on the market even though ACCLARENT has known since 2019 that it was prone to unresolved kinking problems and connectivity issues that both lead to accuracy issues with navigation with the PRODUCT IN QUESTION. ACCLARENT has even recently reported to the FDA that the SpinPlus Nav balloon "became permanently kinked in three different directions" but it remains on the market and in use on patients during ENT surgery. A probe-based balloon product would be an alternate feasible design

that is more accurate, safer for patients, and is already used by ACCLARENT'S competitors.

22. In 2021, despite the accuracy issues encumbering the PRODUCT IN QUESTION, ACCLARENT decided to add an artificial intelligence (AI) to the PRODUCT IN QUESTION. The ACCLARENT AI technology acquired its machine-based learning from a minimal number of patient CT scans that did not represent sufficient evidence of all the hundreds of unique sinus anatomic variants known. In other words, ACCLARENT used a short story rather than a library to train its AI technology. This AI technology powered such features as TruSeg (segmentation) and TruPath (Path to Target) supposedly to make navigation during ENT surgery more accurate.  Dr. Dean commonly used both features and both TruSeg and TruPath were likely used during the surgery on DONNA CAROL FERNIHOUGH. Despite warnings about safety and accuracy, ACCLARENT rushed this new technology to market without even seeking FDA approval. ACCLARENT did not disclose its problems with accuracy before integrating it into the PRODUCT IN QUESTION.

23. The guidewire distal end sensor design was identified as being particularly problematic and contributory to the accuracy loss problem. Because the microsensor is at the end of the guidewire, when the guidewire kinks or coils it is predictable that location accuracy and connectivity will be impeded or lost. From field complaints, internal investigation, analysis of data, and testing, ACCLARENT knew about significant problems with sensors that were not properly calibrated, shielded, and/or did not work properly to accurately navigate when the  guidewires became kinked/coiled , all of which posed  an extreme risk of harm such as was suffered by DONNA CAROL FERNIHOUGH.

24.     ACCLARENT has identified multiple causes of the location inaccuracy problem. Each of these causes, to the extent they affect precision accuracy, make the device unreasonably dangerous and a likely substantial contributing cause of the loss of location accuracy that was a substantial cause of the incident in question. To the extent there are multiple causes of loss of location accuracy, the multiple causes only serve to increase the risk of failure of the product in question during a procedure that increases the risk of injury, particularly in the case of surgery in the sphenoid sinus.

25.     The PRODUCT IN QUESTION continues to be plagued by inaccurate navigation that is so imprecise it fails to meet clinically acceptable levels for safety and efficacy. Put simply it does not perform as marketed by ACCLARENT.

26.     DONNA CAROL FERNIHOUGH was not the first patient who was seriously injured while undergoing a sinuplasty procedure utilizing the PRODUCT IN QUESTION. She was also not the first patient to have her carotid artery injured from the surgeon being misguided in the sphenoid by the PRODUCT IN QUESTION. On June 3, 2021, Dr. Dean used an ACCLARENT Pivot balloon in the sphenoid sinus which led to a carotid artery injury. The patient suffered from significant blood loss during the procedure and was hospitalized that day for additional care. That surgery was being livestreamed to an offsite audience by an ACCLARENT representative according to Dr. Dean. ACCLARENT representatives Brian Gallagher and Cat McCoy were also in the operating room during the surgery. The Pivot Balloon at issue was sent for testing which revealed the guidewire was kinked and broken with issues that affected its advancing and retracting functionality. This carotid artery/vascular injury incident involving the ACCLARENT Pivot balloon product was not reported to the FDA by ACCLARENT. There was another carotid injury

during sinus surgery using The PRODUCT IN QUESTION with a SpinPlus Nav Balloon System on June 23, 2022, that was a substantial producing cause of the injuries and damages like those sustained by DONNA CAROL FERNIHOUGH. Cat McCoy also participated in that surgical procedure. Just two weeks before that surgery on June 9, 2022, a SpinPlus Nav balloon device with the same lot number as the one used in that surgery was found to be "off by 2 centimeters during treatment in the sphenoid sinus" per ACCLARENT's narrative to the FDA. Later testing showed the SpinPlus Nav balloon device to be kinked with failed electrical functionality and with shield isolation from sensor values found to be out of specification. There were feasible alternative designs available on the market at the time the PRODUCT IN QUESTION was placed in the stream of commerce that would have likely eliminated the carotid artery injuries sustained by DONNA CAROL FERNIHOUGH and the other patients.

27. ACCLARENT and INTEGRA have recalled various components of the PRODUCT IN QUESTION system. ACCLARENT and INTEGRA, through their authorized agents, have acknowledged that the recalls deal with reported complaints of navigational inaccuracy. Unfortunately, even the recall efforts have failed to fix the well-known accuracy issues. These continuing accuracy complaints over the years should have put ACCLARENT on notice of a potential design or manufacturing defect in the PRODUCT IN QUESTION, including the TruDi Navigation System and its essential component parts and/or its navigable devices and balloon systems (the Pivot Balloon System and the Relieva SpinPlus NAV System) as well as the TruDi NAV Suction.

28. The recalls are believed to have a common underlying failure mode or cause: defectively dangerous, inconsistent, and imprecise navigation of the PRODUCT

IN QUESTION during procedures or loss of location accuracy similar to the circumstances in the surgical procedure performed on DONNA CAROL FERNIHOUGH, particularly when using the essential components and navigable devices with the PRODUCT IN QUESTION. This unreasonably dangerous condition existed before and during DONNA CAROL FERNIHOUGH's surgery leading to severe injury.

29.    The ACCLARENT TruDi Nav Suction was recalled in 2019 and 2021 due to accuracy problems. That same navigable device was again recalled in 2024 by INTEGRA, the legal manufacturer of the PRODUCT IN QUESTION and its navigable devices, including the suction device. The recall documentation shows that the ACCLARENT conceded improper calibration issues could cause injuries, including injuries to the carotid artery such as experienced by DONNA CAROL FERNIHOUGH. The recall demonstrates that there are ongoing, inherent design defects with the PRODUCT IN QUESTION that make it unreasonably dangerous.

30.    More recently, INTEGRA has issued a voluntary recall of the Multi-Instrument Adapters Part # EM-2025-000F Revision 00 and Revision 01 which are an integral part of the PRODUCT IN QUESTION. These recalled Multi-Instrument Adapters were likely used in the surgical procedure on DONNA CAROL FERNIHOUGH. The recall stated that the PRODUCT IN QUESTION "may not meet its specified accuracy for visual verification of device location within the patient's anatomy" when using the Multi-Instrument Adapters Part # EM-2025-000F Revision 00 and Revision 01.Dr. Dean had complained of accuracy problems with Multi-Instrument Adapters both before and after PLAINTIFF'S surgery. Ironically, Dr. Dean had specifically been using the currently recalled Multi Instrument Adapters Revision 00 and 01 because he thought those

adapters were more accurate and safer for his patients rather than the problematic Multi Instrument Adapters Revision 02 and Revision 03. INTEGRA admits in its recall letter to users that the accuracy issue with the Multi-Instrument Adapter Revision 00 and 01 can "result in injury to the carotid artery" as was sustained by DONNA CAROL FERNIHOUGH. The Multi- Instrument Adapter is an essential component of the PRODUCT IN QUESTION because it connects various ACCLARENT navigable devices and other components to the TruDi Navigation System. If the adapter does not function properly, it is predictable that connectivity, communication, and computation for submillimeter accuracy during navigation will not be achieved. This fact made it foreseeable that serious injury to vital organs such as the carotid artery could occur when the PRODUCT IN QUESTION is employed for surgery in the sphenoid sinus.

31.    The DONNA CAROL FERNIHOUGH injury fits a recognizable pattern of incidents and complaints reported to ACCLARENT regarding the problems and defects of the PRODUCT IN QUESTION from 2019 to present. Disturbingly, there were other similar incidents before and after DONNA CAROL FERNIHOUGH'S procedure, including other patients experiencing severe injuries and near misses from the use of the PRODUCT IN QUESTION.

32.    Both ACCLARENT and INTGRA have had many opportunities to make the PRODUCT QUESTION safer such as changing as well as improving original design choices about registration , guidewire-based products, and unstable connectivity , as well as timely removal of the reusable Patient Trackers from the market , expanding the working volume for sphenoid sinus cases, and being transparent about the multiple accuracy issues  associated with the PRODUCT IN QUESTION. Instead, ACCLARENT

and INTEGRA have continued to hide the known dangers from users of the PRODUCT IN QUESTION and the sales representatives who continue to use a sales pitch to market the product that is misleading and ultimately compromises patient safety.

33.     INTEGRA, as the parent company of ACCLARENT, has declared with the FDA that it is the "legal manufacturer" of the PRODUCT IN QUESTION.  Indeed, INTEGRA identified itself as the manufacturer of the PRODUCT IN QUESTION on a recall initiated on July 9, 2024.  INTEGRA has undertaken and shares with ACCLARENT the role, functions, responsibilities, and accountability of manufacturer, developer, assembler, integrator, developer, marketer, and seller of the PRODUCT IN QUESTION, including the TruDi Navigation system, its component parts, and navigable devices that were used in the surgical procedure performed on DONNA CAROL FERNIHOUGH on May 19, 2023.

## CAUSES OF ACTION

## ACCLARENT, INC.

## STRICT PRODUCTS LIABILITY

34.     PLAINTIFF incorporates by reference her allegations set forth above in paragraphs 1 through 33.

**ACCLARENT'S ROLE IN DESIGN, MANUFACTURE, MARKETING, AND SALES OF THE DEFECTIVE PRODUCT IN QUESTION**

35.     At all times relevant to this lawsuit, ACCLARENT was engaged in the business of manufacturing, assembling, supplying, integrating, marketing, selling, and distributing medical devices, such as the PRODUCT IN QUESTION.

36.     ACCLARENT was a designer, adapter, integrator, developer, manufacturer marketer, distributor, seller, service, and warranty provider of the PRODUCT IN QUESTION that was used by Dr. Dean during the procedure on DONNA CAROL FERNIHOUGH.

37.     ACCLARENT, in the alternative, undertook the role of a designer, adapter, manufacturer, developer, assembler, integrator of component parts, distributor, marketer, and seller of the PRODUCT IN QUESTION, that was used in the procedure performed on DONNA CAROL FERNIHOUGH

38.     In the alternative, ACCLARENT, at all times relevant to this cause of action, ACCLARENT controlled the design, adaptation, development, manufacture, assemblage, marketing, and sale of the PRODUCT IN QUESTION, including its navigable devices/tools that attached to it including the Pivot ballon product. ACCLARENT retained or exercised control over the design, development, manufacture, and marketing of the PRODUCT IN QUESTION after it was released for sale to the market. ACCLARENT controlled the financing and budgeting of the production of the PRODUCT IN QUESTION and the commercial release of the PRODUCT IN QUESTION, as well as all post market development and implementation of upgrades, updates, improvements, and launching of new products.

39.     In the alternative, ACCLARENT substantially or significantly participated in the design, manufacturer, assembly, development, testing, quality control, marketing, distribution, and sale of the  PRODUCT IN QUESTION'S essential component parts and approved navigable devices or tools, directly or through third party suppliers, over which it retained and exercised control over specifications, processes, manufacturing, quality

control, packaging and distribution. ACCLARENT also conducted, supervised, directed and controlled the design, manufacturer, assembly, specification compliance, development, testing, quality control, marketing and distribution of the Multi Instrument Adapters (dongles) required to connect the navigable devices/tools to the PRODUCT IN QUESTION.

40.    ACCLARENT had supplier quality agreements through which it retained the right to control and did exercise control over the design, manufacture, distribution, improvement, packaging, testing, and quality control of the essential component parts for the PRODUCT IN QUESTION. More specifically, through such contracts and agreements, ACCLARENT retained the right to control and conducted, supervised, and directed the design, manufacture, assembly, specification compliance, development, testing, quality control (through quality audits), marketing, and distribution of navigable devices authorized by ACCLARENT for use with the PRODUCT IN QUESTION, including navigable devices and tools, probes, suction devices, Nav wire, and balloon devices that attach to the PRODUCT IN QUESTION through the Multi-Instrument Adapters (dongles) and cables manufactured under ACCLARENT'S supervision, direction, and in compliance with its process and design specifications.

41.    While ACCLARENT reportedly utilized Biosense Webster's CARTO navigation technology, ACCLARENT substantially or significantly participated in modifying it for use in the ENT field. Never before had the CARTO Navigation system been used with ACCLARENT'S tools such as the probe, suction, SpinPlus Nav Balloon, Pivot Balloon Dilation System, and the entire panoply of ACCLARENT tools nor had it been used in the ENT surgical space. This change in usage altered and modified the

original product design creating an unreasonably dangerous PRODUCT IN QUESTION.

42.     In the alternative, ACCLARENT at all times relevant to the instant claims undertook the role and responsibilities of and was the legal manufacturer of the PRODUCT IN QUESTION including all essential component parts and the navigable devices/tools that are attached to the PRODUCT IN QUESTION.  It publicized itself as the manufacturer, sought 510k clearance with the FDA as the manufacturer, interacted with and reported to the FDA as the manufacturer, undertook the role of post market surveillance, and distributed as well as sold the PRODUCT IN QUESTION under its name as the manufacturer. ACCLARENT does so until the present day including current reporting to the FDA as the manufacturer of both the TruDi Navigation System and all of its navigable devices.

43.     ACCLARENT assembled all the PRODUCT IN QUESTION'S essential component parts, navigable devices/tools/ attachments and their component parts and repackaged, sold and distributed the PRODUCT IN QUESTION as its own. In the alternative, ACCLARENT retained or exercised control over these operations.

44.      ACCLARENT sold or in the alternative consigned the PRODUCT IN QUESTION including the navigational devices/tools to Dr. Dean and his professional corporation that were used in the procedure performed on DONNA CAROL FERNIHOUGH.

45.     The PRODUCT IN QUESTION that was used by Dr. Dean during the procedure on DONNA CAROL FERNIHOUGH was defectively designed, manufactured, marketed, and sold by ACCLARENT. The defective nature of the PRODUCT IN QUESTION was a substantial producing cause of the incident in question and the injuries

and damages DONNA CAROL FERNIHOUGH sustained during and as a result of the incident in question.

46.    There were feasible alternative designs available at the time the PRODUCT IN QUESTION was placed in the stream of commerce and subsequently prior to the procedure in question, both with regard to the PRODUCT IN QUESTION, its essential component parts and for the navigable devices/tools that attached to it that would have significantly reduced the risk of the incident and the injuries that DONNA CAROL FERNIHOUGH experienced.

47.    ACCLARENT at all times relevant to the instant cause of action undertook or in the alternative contractually retained and exercised control over the post market monitoring, corrective action planning and implementation, development, updating and upgrading, budgeting and financing of updates, upgrades, and replacements of the PRODUCT IN QUESTION, including the navigational devices/tools that attached to the PRODUCT IN QUESTION. ACCLARENT retained sole decision making authority as to whether or when  to place the  PRODUCT in the stream of commerce and further at all times relevant to the instant cause of action retained control over the funding and implementation of corrective action, upgrades, or developmental improvements regarding THE PRODUCT IN QUESTION, including when such corrective actions, upgrades, or improvements would be made and in what manner such upgrades and improvements would be offered to or made available to end users.

48.     ACCLARENT is the entity that profited from the distribution and sale of the PRODUCT IN QUESTION. ACCLARENT has a budget for research and development, so it has control on when improvements to the PRODUCT IN QUESTION are investigated

and ultimately implemented. ACCLARENT determines what costs to expend, when to expend them, what changes to adopt and when, what price to charge and how best to maximize ACCLARENT's return on investment in the PRODUCT IN QUESTION. ACCLARENT made decisions to maximize profits and took calculated risks with patient safety which ultimately led to the incident made the basis of this lawsuit and other injured patients as well.

## THE DEFECTIVE PRODUCT IN QUESTION

49.    ACCLARENT at all times relevant to this cause of action claimed, marketed, and sold the PRODUCT IN QUESTION as providing navigation with consistent, reliable, submillimeter accuracy during ENT procedures such as the sinuplasty procedure performed on DONNA CAROL FERNIHOUGH. The PRODUCT IN QUESTION, as used in the clinical field and particularly in the procedure in question, was defectively designed and did not provide consistent, accurate, and precise navigation during ENT procedures to industry standards. It is believed that there were defects in the design of the PRODUCT IN QUESTION in terms of registration, calibration, navigation, communication, connectivity, AI inclusion, interface between the navigation system and the navigable devices/tools attached to it, location inaccuracy, and that it did not consistently and reliably perform as intended. This made the PRODUCT IN QUESTION unreasonably dangerous, particularly when used in the sphenoid sinus.

50.    The design of the PRODUCT IN QUESTION was defective in that it was a marriage between two separate products (the TruDi Navigation System and the ACCLARENT ENT navigable devices/tools) that relied on an inadequately tested and

proven Multi -Instrument Adapter to effectuate providing consistent, reliable submillimeter accuracy during sinuplasty procedures. Rather than providing a direct connection as used by ACCLARENT's competitors, ACCLARENT chose to adopt the adapter concept which predictably has proven problematic from the time the PRODUCT IN QUESTION was placed in the stream of commerce up to the present. The Multi-Instrument Adapters #EM-2025-000F Revision 00 and Revision 01 were recalled in October 2025. It was foreseeable that the PRODUCT IN QUESTION would experience connectivity, communication, and navigational accuracy issues because of the inherent defective design of the PROCUCT IN QUESTION, and that such failures could predictably lead to injury of the sinus procedure patient like DONNA CAROL FERNIHOUGH.

51.    In addition to the design defect in employing an adapter to connect the navigable devices/tools with the PRODUCT IN QUESTION, the Multi-Instrument Adapter #EM-2025-000F Revision 00 and Revision 01 was defectively designed and manufactured. The Multi-Instrument Adapter #EM-2025-000F Revision 00 and Revision 01 that Dr. Dean used with the PRODUCT IN QUESTION and navigable devices/tools in question is believed to be part of the lot of multi-use adapters that ACCLARENT subsequently recalled as being defective, unreasonably dangerous and that particularly posed a potential risk of injury to the carotid during ENT surgical procedures. This risk was due to finding that "the system may not meet its specified accuracy for visual verification of the device location within the patient's anatomy." It is believed that the Multi-Instrument Adapter #EM-2025-000F Revision 00 and Revision 01 multi-use adapter used in the procedure in question was a producing cause of the occurrence in question and DONNA CAROL FERNIHOUGH'S injuries and damages for which she makes claim in

this lawsuit.

52.    Additionally, or in the alternative, ACCLARENT'S introduction of artificial intelligence (AI) made the PRODUCT IN QUESTION defective and unreasonably dangerous or, in the alternative, amplified the defective condition of the product to the point of making it unreasonably dangerous particularly for use in ENT procedures generally and in the sphenoid space specifically. The design and performance deficiencies in how the artificial intelligence interfaced with the actual patient's anatomical features resulted in the PRODUCT IN QUESTION not providing consistent, reliable, submillimeter accuracy. This likely was a result of ACCLARENT failing to adequately train artificial intelligence with an adequate number of CT scans of patients with all known variants of sinus anatomy before placing the PRODUCT IN QUESTION in the stream of commerce. These deficiencies adversely affected the consistency, reliability, and accuracy of the TruSeg and TruPath features upon which surgeons, such as the one in question, relied upon when operating particularly in the sphenoid sinus. The decision to add this AI software modification by ACCLARENT introduced a defective condition into the PRODUCT IN QUESTION that made it more dangerous than it was without the modification and increased the risk to the point of being unreasonably dangerous, particularly to patients such as DONNA CAROL FERNIHOUGH. This defective condition was a producing cause of the incident in question and DONNA CAROL FERNIHOUGH'S injuries and damages for which she makes claim in the instant suit. The risk of harm created by ACCLARENT introducing this unnecessary and dangerous condition into the PRODUCT IN QUESTION significantly outweighed any putative benefit to the patient.

53.    The PRODUCT IN QUESTION is also defectively designed because it used

a reusable Patient Tracker and a manual method of registration using a guidewire-based registration probe, both of which demonstrated to be unreliable from the time the PRODUCT IN QUESTION was placed in the stream of commerce.

54.     The reusable Patient Tracker was found to be defectively designed because it moves during procedures which would predictably result in loss of location accuracy during the procedure.  A key design defect in this regard was the implementation of a multiple-use Patient Tracker adhesive that would lose its adhesiveness over the up to fifty (50) times of allowable repeated uses.

55.     Further, the manual registration method using the registration probe was found to be unreliable because of differences in the skin of patients and the touch of users. ACCLARENT'S own patents reveal that ACCLARENT knew at the time the PRODUCT IN QUESTION was placed in the stream of commerce that tactile registration using a guidewire-based calibration instrument was prone to inaccuracy and that contactless registration would significantly improve the accuracy of registration. Merely depressing the skin by a few millimeters could have significant negative impact on the accuracy of the PRODUCT IN QUESTION during a procedure, and which would be beyond the industry standard for an error budget. It was foreseeable that this defective concept and design could and would result in serious injuries to patients particularly when sinus surgery was being performed in the sphenoid space, which has little room for error.

56.     Rather than recognize the defects in the reusable Patient Tracker design and the tactile manual  registration method  with a guidewire-based probe and adopt feasible alternative designs, such as a disposable Patient Tracker and contactless registration or switch to alternative designs that were in the market, ACCLARENT chose

to retain the cheaper more dangerous designs and to deflect accountability to the end user by disingenuously claiming user error.

57.    It is believed the PRODUCT IN QUESTION was also defectively designed because the working volume was insufficient to account for the types of procedures and the manner in which procedures were performed in the sphenoid space. The defective design resulted in the system losing the location of the navigable devices/tools during surgical procedures, particularly in the sphenoid space, which put the patient at increased risk of the surgeon unknowingly impacting a vital organ such as the carotid artery. ACCLARENT also knew that the working volume (TruDi zone) of the PRODUCT IN QUESTION was inadequate and posed an unreasonable risk of loss of location accuracy and harm to the patient, particularly in the sphenoid space. Prior to the occurrence in question, Dr. Dean had alerted ACCLARENT to concerns about the inadequacy of the volume parameters during procedures in the sphenoid space.  ACCLARENT was thus aware of this defect but chose to defer correcting it for other business priorities.

58.    It is believed that the above discussed defects regarding the reusable Patient Tracker, the method of manual registration with a registration probe, and the Multi-Instrument Adapter each separately or cumulatively played a substantial role in causing the occurrence in question and the injuries suffered by DONNA CAROL FERNIHOUGH. There were feasible alternative designs that could have been employed at the time the product in question was placed in the stream of commerce that in reasonable likelihood would have substantially reduced the risk of the occurrence in question and the injuries suffered by DONNA CAROL FERNIHOUGH.  Indeed, ACCLARENT'S own patents and those of its employees / agents demonstrate that not only were feasible alternative

designs available at the time these products were placed in the stream of commerce, but that ACCLARENT considered such alternative designs and rejected them presumably placing profitability over safety.

59.    Additionally, even the Cube Test used to confirm the accuracy of the devices attached to the PRODUCT IN QUESTION itself was defectively designed and/ or interpreted by ACCLARENT which provided invalid assurance that the navigable devices/tools being used with PRODUCT IN QUESTION were properly calibrated and accurate. Additionally, ACCLARENT likely sold navigable devices that actually should have failed location accuracy testing. The inaccuracy of ACCLARENT's accuracy testing created or compounded a risk of harm by providing a false sense of device compliance with minimum accuracy specifications and standards.

## THE DEFECTIVE NAVIGABLE DEVICES/TOOLS

60.    ACCLARENT was also a designer, adapter, integrator, developer, manufacturer marketer, distributor, seller, service and warranty provider of the navigable devices/tools that were used by Dr. Dean during the procedure on DONNA CAROL FERNIHOUGH. These included, but are not limited to, the TruDi Suction, Registration probe, Reusable Patient tracker, The Multi-Instrument Adapter, Pivot balloon dilation systems, guidewires, cabling, and microsensors.

61.    Each of the navigable devices/tools used by Dr. Dean during the procedure on DONNA CAROL FERNIHOUGH were sold or consigned to Dr. Dean by ACCLARENT and each were defectively designed, manufactured, and marketed. The defective nature of each of the navigable devices/tools used by Dr. Dean during the procedure on DONNA CAROL FERNIHOUGH was a substantial producing cause of the incident in question and

the injuries and damages DONNA CAROL FERNIHOUGH sustained during and as a result of the incident in question.

62.     There were feasible alternative designs available at the time when the navigable devices/tools were each placed in the stream of commerce and subsequently prior to the procedure in question that would have significantly reduced the risk of the incident and the injuries that DONNA CAROL FERNIHOUGH experienced.

63.     Previous to the launch of the PRODUCT IN QUESTION,  ACCLARENT had designed, manufactured and marketed ENT surgical tools or devices, however the adaptation of the devices and tools to make them navigable and attachable by the PRODUCT IN QUESTION altered and modified the original products creating unreasonably dangerous navigable devices/tools, or in the alternative, transforming the non-navigable devices and tools into unreasonably dangerous devices/tools.

64.     By redesigning, adapting, and transforming the ACCLARENT ENT devices/tools to be navigated by connecting them to the PRODUCT IN QUESTION through adapters, the devices/tools became unreliable and unreasonably dangerous since the reliability and accuracy of the navigable devices/tools as redesigned was dependent upon a defectively designed  registration method , reusable Patient Tracker, and a Multi-Instrument Adapter. These defective design elements prevented or significantly impeded the PRODUCT IN QUESTION from meeting and consistently and reliably providing the performance goal of consistent, reliable submillimeter accuracy during sinuplasty procedures. It was foreseeable that the PRODUCT IN QUESTION and the navigable devices/tools in question would experience connectivity, communication and consistent accuracy issues because of the inherent defective design of the

PRODUCT IN QUESTION, and that such failures could predictably lead to injury of the sinus procedure patient, including DONNA CAROL FERNIHOUGH.

65.    ACCLARENT at all times relevant to this cause of action claimed, marketed, and sold the navigable devices/tools in question as "plug and play" devices/tools providing navigation with consistent, reliable, submillimeter accuracy during ENT procedures such as the sinuplasty procedure performed on DONNA CAROL FERNIHOUGH without the need for any later calibration. This marketing representation is misleading and false.

66.    The navigable devices/tools, particularly the navigable devices/tools used in the clinical field and particularly in the procedure in question, were defectively designed and did not provide consistent, accurate, and precise navigation during ENT procedures. It is believed that there were also defects in the design of the navigable devices/tools themselves in terms of registration, calibration, connectivity, software interface, interface between the navigation system and the navigable devices attached to it, location inaccuracy, and mechanical design defects (i.e. use of flexible guidewires and distal end microsensors) and that that did not consistently, reliably, accurately and safely perform as intended. This made the navigable devices/tools in question and the PRODUCT IN QUESTION unreasonably dangerous, particularly when used in the sphenoid space.

67.    The Pivot balloon system utilized in the procedure in question was defectively designed, particularly regarding its employment of a guidewire with a distal end micro-sensor and its issues with advancing/retracting functionality. The Pivot balloon was developed to replace the SpinPlus Nav Balloon Dilation System because of the many complaints that had been received about its inaccurate and unreliable performance in ENT procedures. A primary complaint was about the guidewires kinking and the system

losing location accuracy as a result. ACCLARENT, following the procedure in question, additionally removed the Pivot Balloon from the marketplace and it no longer markets or sells this product. Before its removal from the marketplace, there were many complaints about the Pivot Balloon System, particularly regarding its guidewire design and mechanical deployment issues. The Pivot balloon system was placed in the stream of commerce with manufacturing defects that affected its normal and safe use and a design that was defective. There was technologically feasible alternate design using a probe - based balloon product but ACCLARENT chose not to do so. This alternative design and manufacturing conforming to acceptable standards in the medical device industry likely would have substantially reduced the risk of the occurrence in question and the injures DONNA CAROL FERNIHOUGH has sustained because of the occurrence.

68.     The microsensor and shield employed on the distal end of the  Pivot Balloon guidewire employed with THE PRODUCT IN QUESTION in the procedure on DONNA CAROL FERNIHOUGH were each or cumulatively were defectively designed as employed with the navigational guidewire on the pivot balloon system because when the guidewire would kink, bend , or coil impacting the microsensor's ability to accurately and timely provide location accuracy. It is believed there that the distal end microsensor and shield are defectively designed as the accuracy of such a device with this configuration can easily lead to problems caused by loss of accuracy due to distortion of the guidewire or of the microsensor casement, or both. The loss of orientation accuracy and the delay in data communication were probably a substantial contributing cause of the incident in question and the injuries for which DONNA CAROL FERNIHOUGH makes claim in this lawsuit.

69.     There was a feasible alternative design available at the time the microsensor/guidewire device was placed in the stream of commerce. Other manufacturers in the marketplace at the time this product was introduced in the stream of commerce used a different design which did not place a microsensor at the distal tip of a guidewire which is demonstrably safer.

70.     The Pivot and SpinPlus Nav balloon dilation systems are not the only ACCLARENT navigable product that is defective. The suction device also is defectively designed and unreasonably dangerous.  It is believed the suction device Dr. Dean used in the procedure in question was defectively designed such that during the procedure it loses connectivity, communication, and location accuracy. Indeed, the suction device following the occurrence in question was voluntarily recalled. This defective condition was a substantive producing cause of the incident in question.

71.     ACCLARENT at all times relevant to this cause of action assumed, undertook, retained and exercised sole responsibility for the maintenance, service, provision of needed hardware and software upgrades to Dr. Dean and his professional corporations , for troubleshooting issues, for notifying Dr. Dean and his professional corporations of any defects, problems, warnings or other issues related to the  PRODUCT IN QUESTION and the navigable devices/tools in question  purchased or provided to Dr. Dean and his professional corporations in consideration for his consultative services to ACCLARENT.  Through these consulting agreements, ACCLARENT assumed, undertook, and retained sole decision-making authority and control to determine, among other things, what hardware and software needed to be replaced, upgraded, or repaired as well as the timing of those actions and services. Similarly, ACCLARENT assumed,

undertook, and retained sole authority and control to notify Dr Dean and his professional corporations of problems with THE PRODUCT IN QUESTION, the navigable devices/tools and adapters, to timely notify or warn Dr. Dean of safety issues, when to discontinue use of certain components found to be defective or that posed an unreasonable risk to patients, or of changing or upgrading component parts, and to timely recall damaged or defective parts and attachments.

## DEFECTIVE MARKETING

72.    ACCLARENT failed to adequately inform and warn of the dangerous inherent conditions of the PRODUCT IN QUESTION at the time the PRODUCT IN QUESTION left the possession of ACCLARENT and as additional information became known to ACCLARENT that was a substantial producing cause of injury to DONNA CAROL FERNIHOUGH'S carotid artery and of the catastrophic injuries for which DONNA CAROL FERNIHOUGH makes claim in this case.

73.    Still further in addition or in the alternative, PLAINTIFF believes there was a defect in instructions or warnings at the time the PRODUCT IN QUESTION and each of the navigable devices/tools in question left the possession of ACCLARENT that was a substantial producing cause of the injury to DONNA CAROL FERNIHOUGH'S carotid artery, and of the catastrophic injuries for which DONNA CAROL FERNIHOUGH makes claim in this case. In the alternative, through post market surveillance which ACCLARENT undertook, it learned before the procedure in question that one or more of the navigable devices that were used by Dr. Dean in the procedure were defectively designed or manufactured, that the defect could result in catastrophic injury to a patient's carotid artery, yet ACCLARENT did not adequately inform or warn Dr. Dean how to avoid this

risk.

74.     ACCLARENT concealed from its sales representatives who were marketing the device and involved in the use of the device during procedures that ACCLARENT had notice of defects and injuries and the extreme risk of harm posed by the defects identified in the PRODUCT IN QUESTION and navigable devices/tools in question, particularly the defects referenced above. This information also was concealed from end users such as Dr. Dean ACCLARENT knowingly distributed, sold, or in the alternative, leased or consigned the PRODUCT IN QUESTION to Dr. Dean or Texas Health LLC for use by Dr. Dean. Such defects included the unreasonably dangerous design of the reusable patient tracker which allows movement of the tracker thus causing inaccurate location and navigation; the unreasonably dangerous design of the  manual registration with a registration  probe that foreseeably resulted in inaccurate registration, inaccurate location and inaccurate navigation; defectively designed and manufactured  The Multi-Instrument Adapters  which before DONNA CAROL FERNIHOUGH'S surgery ACCLARENT knew could result in inaccurate location and navigation and which could result in the injury that DONNA CAROL FERNIHOUGH has experienced, defective suction devices that were prone to loss of location accuracy; a defective balloon system design that incorporated guidewires that ACCLARENT knew could kink and coil causing inaccurate location and navigation, and defectively designed microsensors that ACCLARENT knew would provide inaccurate location and navigation, particularly  if the guidewire to which such microsensors were attached kinked or coiled; and defectively designed working volume that was inadequate to maintain location accuracy and navigation accuracy particularly for procedures in the sphenoid sinus.   These defective conditions were each and

cumulatively a substantial cause of the incident in question, and for each and all there were alternative designs that feasibly could have been implemented at the time the PRODUCT IN QUESTION and the navigable devices/tools in question were placed in the stream of commerce, or implemented post market prior to DONNA CAROL FERNIHOUGH'S procedure, that would have significantly reduced the risk of the occurrence and the resulting injuries and damages to DONNA CAROL FERNIHOUGH.

## CAUSATION

75.    At the time of  DONNA CAROL FERNIHOUGH'S surgery, the  PRODUCT IN QUESTION and navigable devices/tools in question  were each  in substantially the same condition as they (including all essential component parts) were at the time ACCLARENT released them into the stream of commerce, and no material, unforeseeable alterations were made to any part of such PRODUCTS unless done by ACCLARENT or with ACCLARENT'S knowledge and approval.

76.    There was no reported unforeseeable misuse of the PRODUCT IN QUESTION or of any of the navigable devices/tools in question that was a substantial producing cause of the incident in question and DONNA CAROL FERNIHOUGH'S damages in this case. Dr. Dean is believed to have used the PRODUCT IN QUESTION and each of the navigable devices/tools in question regarding DONNA CAROL FERNIHOUGH in conformance with and reliance upon the way that ACCLARENT had instructed him, through instruction by ACCLARENT representatives and agents, and through information for use literature approved by ACCLARENT, and that ACCLARENT had ratified from previous information it had obtained regarding Dr. Dean's clinical practices.

77.     The aforementioned design, manufacturing, and marketing defects in the PRODUCT IN QUESTION and in each of the navigable devices/tools in question were singularly or in the alternative cumulatively each a substantial producing cause of  injury to DONNA CAROL FERNIHOUGH'S carotid artery and brain  as well as the catastrophic injuries and damages for which DONNA CAROL FERNIHOUGH makes claim in this case.

## ACCLARENT NEGLIGENCE

78.     PLAINTIFF incorporates by reference her allegations set forth above in paragraphs 1 through 77.

79.     ACCLARENT breached the duty of reasonable care owed to DONNA CAROL FERNIHOUGH in the following ways.

80.     ACCLARENT was negligent in the designing, manufacturing, assembling, integrating, developing, marketing, distributing, selling and servicing THE PRODUCT IN QUESTION and the navigable devices/tools in question.

81.     ACCLARENT was negligent in formulating and controlling the design and process specifications to which the PRODUCT IN QUESTION, its essential component parts, and the navigable devices/tools in question were to conform.

82.     It is believed that ACCLARENT was substantially or significantly involved in and controlled the design, manufacture, assemblage, marketing, testing, and integrations into the PRODUCT IN QUESTION and the navigable devices/tools in question, and that ACCLARENT not only controlled the design, manufacture of the PRODUCT IN QUESTION, but when and how it was released to the public. In these regards, ACCLARENT was negligent in placing a defectively designed, manufactured, and marketed product into the stream of commerce.

83.   ACCLARENT retained sole decision-making authority over budgeting for the PRODUCT IN QUESTION and consequently retained sole decision making over production and marketing. ACCLARENT at all times relevant to this claim retained and exercised control of whether or when to place the PRODUCT IN QUESTION and the navigable devices/tools in the stream of commerce and further at all times relevant to the instant cause of action retained control over the funding and implementation of post market upgrades or developmental improvements to the PRODUCT IN QUESTION and the navigable devices/tools in question, including when such upgrades or improvements would be made, and in what manner such upgrades and improvements would be offered to or made available to end users. ACCLARENT was negligent in the performance of these operations, functions, and duties which it undertook.

84.   ACCLARENT was negligent in the formulation of design and process specifications for the essential component parts of the PRODUCT IN QUESTION and for the navigable devices that ACCLARENT approved for attachment to and use with the PRODUCT IN QUESTION. ACCLARENT also was negligent in controlling how the devices were manufactured, and how the component parts were assembled into the PRODUCT IN QUESTION.

85.   The design concept of the PRODUCT IN QUESTION, which ACCLARENT controlled, was both defective and negligently conceived, developed and marketed, particularly when used with the navigable devices/tools in question was defective and unreasonably dangerous. The marriage of the TruDi Navigation System with the ACCLARENT ENT surgical tools through an adapter connector was a defective design. The connectivity design marrying two different technologies by way of an inadequately

tested and defectively designed adapter was deficient and negligent in that it failed to provide consistent, reliable connectivity which in turn prevented the device from providing consistent, reliable, submillimeter accuracy as designed and promoted. This negligence was a proximate cause of the incident in question and DONNA CAROL FERNIHOUGH'S injuries and damages for which she makes claim in the instant suit.

86.     ACCLARENT was negligent in designing, manufacturing, developing, adapting, marketing, distributing and selling the navigable devices/tools that attach to the PRODUCT IN QUESTION, particularly such devices/tools used in the procedure in question. The navigable tools/devices were negligently comprised of clinically untested or inadequately tested components such as cables, guidewires, microsensors, and adapters/dongles that were each or in the alternative cumulatively unreasonably dangerous, particularly when integrated into the navigation system. These defective conditions rendered the navigable devices/tools and the PRODUCT IN QUESTION when used with the navigable devices/tools unreasonably dangerous when the utility of these products is weighed against the gravity and likelihood of harm being caused to a patient such as DONNA CAROL FERNIHOUGH undergoing a sinuplasty procedure, particularly in the sphenoid sinus.

87.     It is believed that ACCLARENT was negligent in approving and adopting the design of the Multi-Instrument Adapter (dongles) and the use of such adapters (dongles) as part of the PRODUCT IN QUESTION in that the designs were negligently conceived and implemented. They added an unnecessary level of disruption to the connectivity and communication between the navigable devices and the system hardware and software instead of direct connection system. This is particularly true of the Multi-

Instrument Adapter #EM-2025-000F Revision 00 and Revision 01, which was recalled after the incident in question because it was found that its defective design or manufacture could potentially lead to injury of the carotid artery as occurred in the instant case. ACCLARENT'S decision to utilize this defective design in PRODUCT IN QUESTION made it unreasonably dangerous. This negligence was a proximate cause of the incident in question and DONNA CAROL FERNIHOUGH'S injuries and damages for which she makes claim in the instant suit.

88.    It is believed that ACCLARENT was negligent in placing the PRODUCT IN QUESTION in the stream of commerce without adequate real world testing of its integrated design system, particularly how the component parts, including Registration process and probe, Patient Trackers, microsensors, guidewires,  Multi- Instrument Adapters/dongles, cables, emitter pads,  hubs, interacted with the TruDi Navigation System, including its navigable devices and the Pivot and SpinPlus Nav balloon systems with regard to providing consistent, accurate, and reliable beginning to end registration, orientation, and precise navigation. It is believed that ACCLARENT placed the PRODUCT IN QUESTION in the stream of commerce without adequate real world clinical testing and have, in effect, conducted post-market testing from 2019 through the present that should have been done before the PRODUCT IN QUESTION was placed in the stream of commerce and failed to promptly act on  the results of testing and post market surveillance.  It is believed that by failing to adequately test and respond to any later test results  that ACCLARENT failed to act with ordinary care with respect to any testing regarding  the PRODUCT IN QUESTION. Such negligence resulted in placing in the stream of commerce an unreasonably dangerous product that was a proximate cause of

the incident in question and DONNA CAROL FERNIHOUGH'S injuries and damages for which she makes claim in the instant suit.

89.    ACCLARENT negligently failed to interact with the FDA with candor and failed to provide candid information to the FDA and surgeons during and after the 510k process for Version 2 and Version 3 of the TruDi Navigation System about the major deficiencies of and the addition of AI into the PRODUCT IN QUESTION. This negligence on the part of ACCLARENT rendered the PRODUCT IN QUESTION unreasonably dangerous. Further, ACCLARENT was negligent in failing to report all incidents involving the PRODUCT IN QUESTION and its navigable devices/tools in question, including incidents involving similar products, similar events, and similar injuries as suffered by PLAINTIFF including an event that occurred on June 3, 2021. ACCLARENT further was negligent in mischaracterizing and underreporting the significance of untoward events regarding the PRODUCT IN QUESTION, including the navigable devices/tools. This negligence was a proximate cause of the PRODUCT IN QUESTION and its navigable devices/tools in question not being recalled, replaced, or improved to eliminate or significantly mitigate the risk and potential catastrophic harm posed by their singular and cumulative unreasonable dangerous design and condition.

90.    It is believed that ACCLARENT was negligent in implementing into the software of the PRODUCT IN QUESTION and marketing what it referred to as artificial intelligence in September 2021. It is believed that this modification was premature and not fully and properly tested or refined before introducing the product with this modification into the clinical marketplace. ACCLARENT knew or should have known that the purported artificial intelligence caused or exacerbated the tendency of the integrated navigation

system product to be inconsistent, inaccurate, and unreliable in providing accurate and reliable registration and navigation, especially when TruSeg and TruPath was used by ENT surgeons. This negligence was a proximate cause of the incident in question and DONNA CAROL FERNIHOUGH'S injuries and damages for which she makes claim in the instant suit.

91.    It is believed that ACCLARENT was negligent in placing the PRODUCT IN QUESTION into the stream of commerce when it did because it had not adequately, sufficiently, or with ordinary care, trained the PRODUCT'S artificial intelligence software. A very small number of CT scans were used to train the model.  This made the artificial intelligence component unreasonably dangerous and was a proximate cause of the incident in question and DONNA CAROL FERNIHOUGH'S injuries and damages for which she makes claim in the instant suit. Moreover, ACCLARENT knew and disregarded that artificial intelligence was a negligent and premature choice to incorporate in their design.

92.    ACCLARENT was negligent in the design, manufacture, and post market selling of the PRODUCT IN QUESTION regarding the use of the reusable Patient Tracker The reusable Patient Tracker was found to move which would result in loss of location accuracy during the procedure. ACCLARENT identified this defect and risk contemporaneous with the launch of the PRODUCT IN QUESTION yet chose not to correct the defect timely with a disposable Patient Tracker which was already in existence and was more reliable in maintaining accuracy during the surgical procedure because of profitability considerations.

93.    Early in the development and launching of the PRODUCT IN QUESTION,

ACCLARENT identified that manual or tactile registration with a registration probe was unreliable and problematic due to accuracy concerns. This defect in the design of tactile registration is discussed in patents obtained by or on behalf of ACCLARENT many years before PLAINTIFF'S surgery .ACCLARENT determined that contactless or optical registration was more accurate and safer for patients because tactile registration could be off by many millimeters that would significantly impact the location and navigation accuracy of the navigable devices thus putting the patient at risk for severe harm when having ENT surgery. Rather than adopting the concept of contactless or optical registration which was both technologically and economically feasible as discussed in ACCLARENT'S own patents and had been embraced by ACCLARENT'S competitors, ACCLARENT negligently chose to stay with the cheaper more dangerous design and deflect accountability by claiming user error.

94.     ACCLARENT was negligent in designing, manufacturing, assembling, testing, and integrating into THE PRODUCT IN QUESTION its Balloon Dilation Systems, particularly the Pivot balloon System and the SpinPlus Nav balloon, as well as approving distribution of balloons that used guidewires with distal end microsensors. The defective design, guidewire kinking, mechanical issues with use of the balloon, and connectivity issues as well as calibration problems amplified the defective design of the PRODUCT IN QUESTION, making it unreasonably dangerous. This negligence was a proximate cause of the incident in question and DONNA CAROL FERNIHOUGH'S injuries and damages for which she makes claim in the instant suit.

95.     It is believed that ACCLARENT was negligent in designing, manufacturing, testing, and integrating into THE PRODUCT IN QUESTION the guidewires with distal end

microsensors incorporated into the allegedly plug and play navigable devices used with the navigation system. The defective design with guidewire-based navigable devices with microsensors at their distal tip amplified the defective design of the PRODUCT IN QUESTION making it unreasonably dangerous. ACCLARENT knew from its own experience and language in its patents that guidewires could and would frequently kink or bend during surgical use. This fact was affirmed by ACCLARENT's post market surveillance long before the procedure on DONNA CAROL FERNIHOUGH. Further it was known that kinking, bending, or coiling of a guidewire-based device during a surgical procedure could cause disruption and degradation to location accuracy which could lead to the injury DONNA CAROL FURNIHOUGH sustained. This negligence was a proximate cause of the incident in question and DONNA CAROL FERNIHOUGH'S injuries and damages for which she makes claim in the instant suit.

96.    ACCLARENT at all times relevant to the instant cause of action was negligent in the performance of post market surveillance, development, updating and upgrading, budgeting and financing of updates, upgrades, design changes, field actions, and replacements regarding the PRODUCT IN QUESTION.

97.    Aside from its significant participation in the design, development, manufacture, and marketing of the PRODUCT IN QUESTION, ACCLARENT was the sole seller of the PRODUCT IN QUESTION. As the seller of the PRODUCT IN QUESTION, ACCLARENT was negligent and engaged in negligent conduct which was a proximate cause of the occurrence in question and DONNA CAROL FERNIHOUGH'S alleged injuries and damages.

98.    ACCLARENT was negligent in undertaking the responsibility and

accountability of post market surveillance for the PRODUCT IN QUESTION, the components of the PRODUCT IN QUESTION, and for the ACCLARENT navigable devices that attached to and formed a part of the PRODUCT IN QUESTION. It was negligent in compiling data that should have informed a reasonably prudent medical device manufacturer that the PRODUCT IN QUESTION posed a serious risk of harm to patients undergoing sinus procedures such as the one in question, particularly in the sphenoid sinus space. ACCLARENT was negligent in how it categorized and analyzed such data and regarding the upgrading and implementation of safer componentry to its end users. It also was negligent in failing to inform its customers and end users of the PRODUCT IN QUESTION of the data that it had compiled about the defects and risks it had identified and of the mitigating products available to its customers and end users. ACCLARENT also was negligent in failing to use ordinary care in informing its customers and end users of the PRODUCT IN QUESTION of the risks it had identified in continuing to use the PRODUCT IN QUESITON with the componentry and navigable devices its data showed were unreasonably dangerous.

99.    As part of the duty undertaken by ACCLARENT to perform post-market surveillance on the PRODUCT IN QUESTION ACCLARENT undertook the duty to monitor the use of the PRODUCT IN QUESTION in the marketplace or clinical practice after it was placed in the stream of commerce and prior to the incident in question. This duty, which ACCLARENT undertook, included formulating a protocol for clinicians and healthcare professionals to report concerns, complaints, incidents, near misses, and adverse events, to ACCLARENT so that ACCLARENT could investigate and test such complaints and claims for product defects and malfunction. The duty also included the

creation of a complaint database in which ACCLARENT compiled complaints that were reportable events to the FDA as well as complaints that were determined to be "unreportable." This duty included a duty to investigate each complaint with ordinary care, attempt to identify a root cause, conduct trend analysis, and attempt to timely eliminate the defect or mitigate the risk from the defect. The duty also included reporting adverse events to the FDA and compiling, trending, investigating, and responding to complaints from the field regarding any issue with the use and function of the PRODUCT IN QUESTION, including incidents resulting in injury as well as near-miss incidents. ACCLARENT negligently breached these duties.

100.    ACCLARENT negligently failed to timely and adequately address and correct defects and potential risks identified during post market surveillance during the total life cycle of the PRODUCT IN QUESTION which includes failing to take timely corrective and preventive action, issue field actions, or suspending manufacturing or sales so that the PRODUCT IN QUESTION did not injure anyone.

101.    ACCLARENT undertook the duty and retained the right to monitor and exclusively maintain the function, performance, and operation of the PRODUCT IN QUESTION directly or through its authorized consultants/representatives who were typically present in the operating room during surgical procedures. It is believed that ACCLARENT failed to perform this duty with ordinary care which was a proximate cause of the incident in question. In the alternative, ACCLARENT was negligent in training and informing its sales force regarding the deficiencies and defects that ACCLARENT identified with the PRODUCT IN QUESTION.

102.    ACCLARENT negligently failed to implement a preventive and corrective

action program in compliance with industry standards. It negligently failed to timely recall, stop selling, marketing, and/or promoting the PRODUCT IN QUESTION particularly after it received repeated notice from the field that the PRODUCT IN QUESTION was not consistently providing the accurate registration, orientation, and precise submillimeter accuray that ACCLARENT assured the clinical community the device would consistently deliver throughout ENT surgical procedures, particularly in surgical procedures such as the one in question.

103.   ACCLARENT additionally was negligent in the tests it created and performed to confirm the accuracy of the devices used with the PRODUCT IN QUESTION, leading to inaccuracy of the devices and the risk of harm that DONNA CAROL FERNIHOUGH experienced.

104.   Prior to the incident in question, ACCLARENT negligently failed to heed, interpret, compile, investigate, or respond to the results of complaints and formal reports of suspected or actual location inaccuracy and imprecise navigation with near misses and injuries to the carotid artery, optic nerve, brain, or other structures resulting from the use of the PRODUCT IN QUESTION in ENT procedures, particularly those in the sphenoid sinus. This allegation includes failing to properly and timely respond to and fully investigate data compiled by surgeons such as Dr. Marc Dean, ACCLARENT representatives, and other clinical complaints about the failure of the PRODUCT IN QUESTION to perform as intended both before, during, and after DONNA CAROL FERNIHOUGH'S surgery. It is believed that ACCLARENT engaged in the same negligent risk assessment and risk management described above regarding prior incidents and that such negligent conduct was a substantial proximate cause of the defective unreasonably

dangerous condition of the PRODUCT IN QUESTION continuing to exist at the time of ERIN RALPH'S procedure and at the time of DONNA CAROL FERNIHOUGH'S surgery, which was a substantial proximate cause of DONNA CAROL FERNIHOUGH'S injuries claimed in this lawsuit.

105.   ACCLARENT was aware at the time of DONNA CAROL FERNIHOUGH'S surgery that the PRODUCT IN QUESTION could as a result of its defective condition lose location accuracy and cause a surgeon operating in the sphenoid sinus to become disoriented or misdirected which foreseeably could have devastating consequences, including damage to the carotid artery such as DONNA CAROL FERNIHOUGH has experienced or even death, yet ACCLARENT failed to exercise ordinary care to eliminate or significantly mitigate the unreasonably dangerous condition before and after the surgery performed on DONNA CAROL FERNIHOUGH even though reasonable alternative designs and products were feasible to implement.

106.   Before the date of the incident, ACCLARENT was aware of incidents and near miss incidents involving the PRODUCT IN QUESTION and its navigable devices/tools in question, including incidents and near miss events involving similar products, similar events and similar injuries, however, it negligently chose to mischaracterize these incidents, failed to investigate and test the products involved with ordinary care, and failed to properly trend such incidents and events. This negligence proximately resulted in ACCLARENT not exercising ordinary care to correct potential defective conditions before the procedure in question which was a proximate cause of the occurrence in question and the injuries and damages alleged by DONNA CAROL FURNIHOUGH in this litigation.

107.   ACCLARENT was negligent before the date of the incident in question in not timely and properly responding to Dr. Dean's complaints about inaccuracy issues with the PRODUCT IN QUESTION, particularly his complaints about the Multi- Instrument Adapter, location inaccuracy, and the volume inadequacy of the PRODUCT IN QUESTION before and after DONNA CAROL FERNIHOUGH'S surgery. ACCLARENT not only was negligent in failing to timely and properly respond to and inform Dr. Dean about what was found in testing and in his returned navigable devices, but also it was negligent in failing to timely and properly act to address the known defects and deficiencies and to eliminate or significantly mitigate the risk of injury they posed.

108.   Prior to and after the occurrence in question, ACCLARENT breached its duties to perform risk management and quality control management with ordinary care. It violated the Quality System that ACCLARENT was required to follow to ensure a safe product. It is believed that ACCLARENT failed to perform this duty with ordinary care which was a proximate cause of the incident in question and DONNA CAROL FERNIHOUGH'S injuries and damages for which she makes claim in the instant lawsuit.

109.   ACCLARENT was negligent in failing to use ordinary care in the formulation, implementation, or enforcement of proper risk management/quality control programs or protocols and post market surveillance programs including the failure to conduct trend and root cause analysis regarding complaints, particularly involving severe injuries sustained during the use of the PRODUCT IN QUESTION or to adequately test throughout the total life cycles of the PRODUCT IN QUESTION for the efficacy, safety, and accuracy in the clinical setting and when certain lot numbers did not perform as intended.

110.    Following the procedure in question, ACCLARENT reported to the FDA that the device that was used was an ACCLARENT TruDi Navigation system with a Pivot Balloon tool. ACCLARENT apparently did not request that the devices used in the procedure be returned for examination and testing.  ACCLARENT apparently also did not request device identification information either from the reporter, surgeon or ACCLARENT's representative who participated in the procedure, including the lot numbers of the ACCLARENT devices used during DONNA CAROL FERNIHOUGH'S surgery. When reporting the incident to the FDA, ACCLARENT also apparently did not provide the FDA with the sale, service, or maintenance records in its possession regarding its devices used in the procedure. ACCLARENT reported that since it did not retrieve the products involved or the identifying data about them, it was unable to investigate the incident, and the matter was closed. It is believed that ACCLARENT's failure to affirmatively obtain its devices used in the procedure for testing or to compile material information about them is part of a negligent pattern of conduct regarding incidents involving the product in question that contributed substantially to Dr. Dean using a defective unreasonably dangerous product that was a substantial cause of the incident in question and Plaintiff's alleged injuries.

111.    ACCLARENT negligently marketed the PRODUCT IN QUESTION to healthcare providers and healthcare facilities like Dr. Dean and Texas Health LLC as an ENT navigation device that could be relied upon to provide superior, consistent, and precise navigation accuracy over competitor navigation devices. As a result of the defective condition of the PRODUCT IN QUESTION, the PRODUCT could not be relied upon to provide consistent, accurate, and reliable submillimeter accuracy or even

reasonable accuracy during the full course of procedures such as the one in question. This posed an extreme risk of harm when the PRODUCT IN QUESTION was relied upon for consistent and accurate submillimeter accuracy in navigating during an ENT procedure. ACCLARENT'S negligence in these regards was a substantial proximate cause of the incident in question and the injuries and damages for which DONNA CAROL FERNIHOUGH makes claim in the instant suit.

112.   ACCLARENT negligently marketed the PRODUCT IN QUESTION by misrepresenting the safety, consistent reliability, and submillimeter accuracy of the PRODUCT IN QUESTION. Further, ACCLARENT was negligent in rushing to market the PRODUCT IN QUESTION without proper testing and evaluation of post market testing particularly of the PRODUCT IN QUESTION'S integrated system tracking, registration, poor connectivity, improper calibration, a guidewire-based products that kinked, and the product failing to perform as intended.

113.   ACCLARENT negligently exercised control over warnings and instructions relevant to the PRODUCT IN QUESTION in that it failed to properly and timely maintain, update, and service the PRODUCT IN QUESTION utilized in the ENT procedure in question. ACCLARENT also was negligent in failing to warn end users of the design and manufacturing defects ACCLARENT had identified through post-market surveillance which made the PRODUCT IN QUESTION unreasonably dangerous, particularly without adequate warning.

114.   ACCLARENT negligently failed to provide adequate instructions and warnings, or in the alternative failed to exercise ordinary care in providing training, instruction, and warnings to clinical end users about the PRODUCT IN QUESTION. More

particularly, ACCLARENT was negligent in failing to provide adequate warnings or instructions that ACCLARENT had identified in post market surveillance that created an unreasonable risk of harm from use of the PRODUCT IN QUESTION in sinuplasty procedures, particularly within the sphenoid sinus, when the surgeon would not be able to visualize the path of the instrument and would rely on the PRODUCT IN QUESTION for location accuracy. It is believed that absence or inadequacy of such warnings or instructions was a substantial cause of the incident in question and PLAINTIFF'S resulting injuries and damages.

115.   It is believed that ACCLARENT/INTEGRA were negligent in maintaining and servicing the PRODUCT IN QUESTION to provide safe and accurate navigation during ENT procedures such as the procedure performed on DONNA CAROL FERNIHOUGH.

116.   ACCLARENT negligently failed to properly and timely maintain, update, and service the PRODUCT IN QUESTION utilized in the ENT procedure in question. It is believed that ACCLARENT was negligent in maintaining and servicing the PRODUCT IN QUESTION to provide safe and accurate navigation during ENT procedures such as the procedure performed on DONNA CAROL FERNIHOUGH.

117.   ACCLARENT'S acts or omissions or conduct described above were jointly and severally a direct, proximate, and substantial cause of the occurrence in question and DONNA CAROL FERNIHOUGH suffering severe, catastrophic life-changing injuries resulting in the losses and harms for which she has made a claim in this case.

## GROSS NEGLIGENCE

118.   ACCLARENT'S negligent acts and/or omissions, as alleged above, were committed by or under the supervision of one or more of its vice-principals.

119.   Alternatively, ACCLARENT'S negligent acts and/or omissions, as alleged above, were approved or ratified by one or more of its vice-principals.

120.   Each of ACCLARENT'S negligent acts and/or omissions when viewed, separately and/or jointly objectively from the standpoint of the actor, ACCLARENT, at the time of their occurrence, involved an extreme degree of risk considering the probability and magnitude of the potential harm to individuals interfacing with this medical device near major blood vessels, the eyes, and the brain.

121.   ACCLARENT, by and through their vice-principals including JEFF HOPKINS, CHRISTOPHER SCHUTT, M.D., and FRED SCHWARTZ had actual, subjective awareness of the risk involved with the PRODUCT IN QUESTION, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of patients undergoing ENT procedures by knowingly allowing ENT surgeons to use the PRODUCT IN QUESTION even though post market surveillance and repetitive complaints  indicated that it did not meet the required accuracy standards to provide true and accurate orientation and direction, particularly in the sphenoid sinus.

122.   ACCLARENT'S gross negligence is not isolated to one action, one event, or one decision. It is pervasive beginning with ACCLARENT'S decisions prior to and contemporaneous with launching the PRODUCT IN QUESTION.  As demonstrated by ACCLARENT'S patents, it knew from the outset that its registration design was fatally flawed and that feasible, safer alternative designs were available. ACCLARENT chose to

rush the PRODUCT IN QUESTION to market with a cheaper, defective design. It knew that the adapter that was the key to integrating the navigable devices with the navigation system was not sufficiently tested nor reliable. It knew prior to the surgery in question that the Multi-Instrument Adapter that was used in the procedure in question was defective and that it could potentially result in catastrophic injury to the carotid injury, which occurred in the instant case.  ACCLARENT resisted replacing the product or correcting the defect in time for Plaintiff.   ACCLARENT knew that the artificial intelligence that it rushed into its software was not adequately or properly trained. Yet in order to gain market share and visibility, ACCLARENT implemented these functions, nonetheless. ACCLARENT knew from the outset that the end users were not obtaining proper accuracy because of the defective design of the reusable Patient Tracker and manual registration with registration probe, but once again passed on implementing contactless or optical    registration that it knew was a safer alternative design. Instead, ACCLARENT dismissed the complaints as user error. ACCLARENT also knew that flexible guidewire/ distal end microsensor design was critically flawed for use in ENT surgery since the guidewires were prone to kinking and coilin, thus impairing the reliability of the microsensors to provide accurate location and guidance. Yet again, in the interest of profitability, ACCLARENT resisted replacing the design with a probe-based tool design with sensors not at the distal tip which is recognized in the industry as safer and more reliable. Not only did ACCLARENT know prior to the procedure in question that the PRODUCT IN QUESTION including the navigable devices/tools that would be used in the procedure in question was defectively designed and unreasonably dangerous, but it concealed this knowledge from the FDA, its customers, its end users, and even its field representatives whom the customers and

end users relied upon so that they could confidently use PRODUCT IN QUESTION to provide safe, reliable, and accurate navigation for their patients undergoing sinus procedures with the PRODUCT IN QUESTION. This conduct on the part of ACCLARENT is grossly negligent, malicious, and reprehensible.

123.   ACCLARENT'S conduct in the above-stated regards and as described in this petition constitute gross negligence, including acts or omissions: (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others. Such conduct, jointly and severally, was a proximate cause of the occurrence in question and DONNA CAROL FERNIHOUGH'S injuries and damages for which she makes claim in this lawsuit.

## CAUSES OF ACTION

## INTEGRA LIFE SCIENCES

## STRICT LIABILITY

124.   PLAINTIFF incorporates by reference her allegations set forth above in paragraphs 1 through 123. INTEGRA is the apparent manufacturer of the PRODUCT IN QUESTION, It is believed that INTEGRA, as a material part of the transfer service agreement regarding INTEGRA'S acquisition of ACCLARENT, assumed the responsibilities and liabilities that ACCLARENT had as the designer, manufacturer, assembler, component part manufacturer and quality controller, marketer, distributor and seller of the PRODUCT IN QUESTION.

125.   INTEGRA, by voluntarily acquiring the liabilities and responsibilities of ACCLARENT relevant to the design, development, manufacture, marketing, and sales of the PRODUCT IN QUESTION, stepped into ACCLARENT shoes and is responsible and accountable for the PRODUCT IN QUESTION and ACCLARENT'S conduct relative to the PRODUCT IN QUESTION as if INTEGRA were ACCLARENT at all times relevant to this lawsuit.

126.   Alternatively, at all times relevant to the instant cause of action. INTEGRA sought and undertook the role of legal manufacturer regarding the PRODUCT IN QUESTION including the navigable devices/tools attachable to the PRODUCT IN QUESTION, and particularly those devices/tools used in the procedure in question.

127.   At all times relevant to the instant cause of action INTEGRA was the manufacturer of the PRODUCT IN QUESTION, including the navigable devices/tools attachable to the PRODUCT IN QUESTION, and particularly those devices/tools used in the procedure in question as that term is defined in §82.001 Tex. Civ. Prac. & Rem. Code. Specifically, INTEGRA through its acquisition of ACCLARENT, INTEGRA contractually and effectively accepted and undertook ACCLARENT'S accountability and responsibility for designing, manufacturing, developing, adapting, assembling, marketing, distributing and selling the PRODUCT IN QUESTION, and therefore is responsible and accountable for the defective design, manufacture, marketing, and sales of the PRODUCT IN QUESTION and of its navigable devices/tools and essential component parts as alleged against ACCLARENT in the foregoing paragraphs, and particularly for the occurrence in question and the alleged injuries and damages sustained by DONNA CAROL FERNIHOUGH.

## INTEGRA NEGLIGENCE

128.   PLAINTIFF incorporates by reference her allegations set forth above in paragraphs 1 through 128. INTEGRA is the apparent negligent designer, manufacturer, marketer, and negligent seller of the PRODUCT IN QUESTION, including the navigable devices/tools attachable to the PRODUCT IN QUESTION, and particularly those devices/tools used in the procedure in question. It is believed that INTEGRA, as a material part of the transfer service agreement regarding INTEGRA'S acquisition of ACCLARENT, assumed the responsibilities and liabilities that ACCLARENT had as the designer, manufacturer, assembler, component part manufacturer and quality controller, marketer, distributor, and seller of THE PRODUCT IN QUESTION, including the navigable devices/tools attachable to the PRODUCT IN QUESTION, and particularly those devices/tools used in the procedure in question,

129.   INTEGRA, by voluntarily acquiring the liabilities and responsibilities of ACCLARENT relevant to the design, development, manufacture, marketing, and sales of the PRODUCT IN QUESTION, stepped into ACCLARENT shoes and is responsible and accountable for the PRODUCT IN QUESTION and ACCLARENT's conduct relative to the PRODUCT IN QUESTION as if INTEGRA were ACCLERANT at all times relevant to this lawsuit, as set out in the foregoing paragraphs regarding Plaintiff's cause of action against ACCLARENT.

130.   Alternatively, at all times relevant to the instant cause of action. INTEGRA sought and undertook the role of legal manufacturer regarding the PRODUCT IN QUESTION including the navigable devices/tools attachable to the PRODUCT IN QUESTION, and particularly those devices/tools used in the procedure in question,

131.    At all times relevant to the instant cause of action INTEGRA was the designer, manufacturer, marketer, distributer, and seller of the PRODUCT IN QUESTION, including the navigable devices/tools attachable to the PRODUCT IN QUESTION, and particularly those devices/tools used in the procedure in question, as that term is defined in §82.001 Tex. Civ. Prac. & Rem. Code. Specifically, INTEGRA through its acquisition of ACCLARENT, INTEGRA contractually and effectively accepted and undertook ACCLARENT'S accountability and responsibility for designing, manufacturing, developing, adapting, assembling, marketing, distributing and selling the PRODUCT IN QUESTION, and therefore is responsible and accountable for the defective design, manufacture, marketing, and sales of the PRODUCT IN QUESTION and of its navigable devices/tools and essential component parts, as alleged against ACCLARENT in the foregoing paragraphs.

132.    INTEGRA'S negligent acts and/or omissions, as alleged above, were committed by or under the supervision of one or more of its vice-principals.

133.    Alternatively, INTEGRA'S negligent acts and/or omissions, as alleged above, were approved or ratified by one or more of its vice-principals.

134.    Each of INTEGRA'S negligent acts and/or omissions when viewed, separately and/or jointly, objectively from the standpoint of the actor, INTEGRA, at the time of their occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to individuals interfacing with this medical device near major blood vessels, the eyes, and the brain.

135.    INTEGRA, by and through its vice-principals had actual, subjective awareness of the risk involved with the PRODUCT IN QUESTION, but nevertheless

proceeded with conscious indifference to the rights, safety, or welfare of patients such as DONNA CAROL FERNIHOUGH undergoing ENT procedures utilizing and relying upon the PRODUCT IN QUESTION to provide true and accurate orientation and direction, particularly in the sphenoid sinus.

## GROSS NEGLIGENCE

136.   INTEGRA has approved and ratified the negligent and gross conduct of ACCLARENT as described above.

137.   INTEGRA'S acts or omissions or conduct described above were jointly and severally a direct, proximate, and substantial cause of DONNA CAROL FERNIHOUGH'S suffering severe, catastrophic life-changing injuries resulting in the losses and harms for which she has made a claim in this case.

## DAMAGES

138.   DONNA CAROL FERNIHOUGH has sustained permanent and debilitating injuries and damages as a direct and foreseeable result of DEFENDANTS' joint and several negligence, as more specifically delineated above, including the negligence of the DEFENDANTS' respective vice-principals, agents, and employees, as alleged above.

139.   DONNA CAROL FERNIHOUGH has sustained injuries to the physical structure of her body and nervous system, generally resulting in life-disrupting physical pain and mental anguish in the past which in reasonable probability will continue in the future.  More particularly, DONNA CAROL FERNIHOUGH suffered an injury to her carotid artery and her brain that has left her catastrophically and permanently impaired neurologically and physically. DONNA CAROL FERNIHOUGH has sustained diminution of life enjoyment and joy in the past which in reasonable probability will continue in the

future. She has sustained physical impairment in the past which in reasonable probability will continue in the future. She has sustained physical disfigurement in the past which in reasonable probability will continue in the future. She has sustained lost earnings and loss of earning capacity in the past and in the future. DONNA CAROL FERNIHOUGH has sustained a loss of household services in the past and in the future.

140. DONNA CAROL FERNIHOUGH has actually paid or incurred in the past reasonable and necessary expenses for medical and health care, treatment, therapy, rehabilitation, and in reasonable probability, she will continue to incur such reasonable and necessary expenses in the future, including medications and medical services for treatment, care, monitoring, medical care and services, therapy, rehabilitation, environmental and functional oversight, and management of activities of daily living, safety, health, and welfare.

141. DONNA CAROL FERNIHOUGH seeks compensation from each of the DEFENDANTS for all the above-described actual damages deriving directly and foreseeably from the DEFENDANTS' joint and several negligence through their vice-principals, agents, and employees. While DONNA CAROL FERNIHOUGH'S damages exceed the threshold requirements of this Court, she prefers to leave the determination of the actual amounts of these elements of damages and the total amount of just compensation solely to the province of the jury. DONNA CAROL FERNIHOUGH requests that damages be awarded in present value in conformance with the law and instructions given by the Court, as well as in an amount determined by the jury to be fair and reasonable in view of the credible evidence considered by them at time of trial, without regard to bias, sympathy or pity.

142.    DONNA CAROL FERNIHOUGH, has alleged independent facts of grossly negligent conduct against ACCLARENT and against INTEGRA  that entitle her to recover exemplary damages to the full extent allowed by Art. XVI, §26 of the Texas Constitution and §41.003 *et seq.* of the Texas Civil Practice and Remedies Code from ACCLARENT and from INTEGRA  for each of these Defendants' separate grossly negligent conduct that was a proximate cause of the injuries that PLAINTIFF has alleged in this cause. DONNA CAROL FERNIHOUGH accordingly seeks exemplary damages from ACCLARENT and from INTEGRA to the full amount allowed by Texas and U.S. Constitutional law. DONNA CAROL FERNIGHOUGH prefers to leave the precise amount of punitive damages to the sole determination of the jury based upon the credible evidence presented at trial without regard to sympathy, prejudice, or bias. In assessing punitive damages against ACCLARENT and against INTEGRA the jury may  take into account the following considerations: (1) the nature of the respective Defendant's wrong; (2) the character of the wrongdoer; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and (5) the extent to which such conduct offends a public sense of justice and propriety. *Alamo National Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981) and §41.011 Tex. Civ. Prac. & Rem. Code. The jury also should take into account the post incident reprehensible conduct, if any, of ACCLARENT and INTEGRA LIFE SCIENCES through their vice principals, as well as conduct indicating agreement with, approval, or ratification of the wrongful conduct leading to what was a proximate cause of the incident made the basis of this lawsuit and Plaintiff's alleged injuries and damages.

## DEMAND FOR JURY

143.    PLAINTIFF has submitted a jury fee and demands a jury trial of this cause.

## PRAYER

144.    IN VIEW OF THE FOREGOING CONSIDERATIONS AND ALLEGATIONS, PLAINTIFF now prays that each DEFENDANT be cited to appear and answer herein, and that, after due process of law, PLAINTIFF has judgment for actual damages against all DEFENDANTS, jointly and severally, in an amount exceeding the minimum jurisdictional limits of this Court, punitive damages against ACCLARENT and INTEGRA , together with prejudgment interest and post judgment interest in the maximum amounts allowed by law, costs of Court, and for such other and further relief, both general and special, in law and in equity, to which PLAINTIFF may be justly entitled, and for which she will ever pray. PLAINTIFF specifically reserves the right to amend and plead for such other and different amounts of damages to conform with future discovery or evidence produced at trial.

Respectfully submitted,

**AVERSANO & GOLD**

*/s/ Donna M. Aversano*

_____

**DONNA M. AVERSANO**
State Bar No. 00783573
donna@CuttingEdgeJustice.com
**PAUL N. GOLD**
State Bar No. 08069700
paul@CuttingEdgeJustice.com
2716 Beauchamp St.
Houston, Texas 77009
(713) 426-5600 Telephone
(713) 426-5601 Facsimile

**ELIZABETH FRALEY**
State Bar No. 13180500
elizabeth_fraley@baylor.edu
One Bear Place #97288
Waco, TX 76798
(254) 710-3986 Telephone

**LARS L. BERG**
Local Counsel
State Bar No. 00787072
lars.berg@kellyhart.com
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
(817) 878-3524 Telephone

**SHELBY J. WHITE**
State Bar No. 24084086
swhite@dpslawgroup.com
DURHAM, PITTARD & SPALDING, LLP
P.O. Box 224626
Dallas, Texas 75222
(214) 946-8000 Telephone
(214) 946-8433 Facsimile

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 6, 2026, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to each attorney of record who have consented in writing to accept this notice as service of this document by electronic means.

*/s/ Donna M. Aversano*

_____

**DONNA M. AVERSANO**